Substitute Opinion Pages 7 to 15 and Page 24 Filed 1/24/25 by Clerk of the Supreme Court

IN THE SUPREME COURT
STATE OF NORTH DAKOTA

2024 ND 212

Northstar Center, LLC,                                    Plaintiff and Appellee

v.

Lukenbill Family Partnership, LLLP,

and Tundra Properties, LLC,                        Defendants and Appellants

No. 20240034

Appeal from the District Court of Williams County, Northwest Judicial District, the Honorable Joshua B. Rustad, Judge.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Opinion of the Court by Bahr, Justice.

Lisa M. Hettich (argued) and Garth H. Sjue (on brief), Williston, N.D., for plaintiff and appellee.

Lawrence E. King, Bismarck, N.D., for defendant and appellant Lukenbill Family Partnership, LLLP.

Erich M. Grant, Minot, N.D., for defendant and appellant Tundra Properties, LLC.

**Bahr, Justice.**

[¶1]   Lukenbill Family Partnership, LLLP and Tundra Properties, LLC appeal from a judgment entered after the district court granted Northstar Center, LLC summary judgment on Northstar's breach of contract claim against Lukenbill; granted Northstar summary judgment on its intentional interference with contract claim against Tundra; granted Lukenbill summary judgment on Lukenbill's indemnification claim against Tundra; and denied Tundra summary judgment on Tundra's breach of warranty claim against Lukenbill. We conclude the court erred by granting Northstar summary judgment on its breach of contract claim against Lukenbill; erred by granting Northstar summary judgment on its intentional interference with contract claim against Tundra; and erred by granting Lukenbill summary judgment on its indemnification claim against Tundra. Because genuine issues of material fact exist precluding summary judgment on Northstar and Lukenbill's claims, we reverse judgment on those claims and remand for further proceedings consistent with this opinion. We further conclude Tundra did not adequately brief whether the court erred in dismissing Tundra's breach of warranty claim against Lukenbill, and therefore waived the issue. We affirm judgment dismissing Tundra's breach of warranty claim.

I

[¶2] Lukenbill owned the disputed property in Williams County, North Dakota. In 2012, Lukenbill entered into a real estate contract ("agreement") to sell the disputed property to Templeton Enterprises, LLC. Templeton later transferred its rights under the agreement to Northstar. Ultimately, Lukenbill sold and transferred the disputed property to Tundra by warranty deed.

[¶3]   The original agreement between Lukenbill and Templeton provided for the sale of a 120-acre parcel ("the disputed property") and the option to purchase another 105-acre parcel. The parties amended the agreement several times. A written amendment was made in February 2013 wherein Templeton and

1

Lukenbill agreed, among other things, to sell the 105-acre parcel first with an option to purchase the 120-acre parcel:

> The parties agree to amend the Purchase Agreement as follows:
> 1. The parties hereby agree to that the first closing on or before March 9, 2013 shall be for the 105 acres shown on exhibit A at the agreed price of $15,000.
> 2. The parties further agree that the remaining option shall be for the 120 acres shown on Exhibit A at the price of $16,000 which shall close on or before March 9, 2014.
> 3. The agreed increase in price due to the tax increase agreed in the original contract shall be due and payable [n]o later than January 1, 2014. The Taxes for the remaining options shall be due and payable no later than January 1, 2015.
> 4. All other terms and conditions remain the same.

Subsection 3 of the February 2013 amendment refers to provision 6(m) of the original agreement, which provides: "If said purchase increases capital gains liability to Seller, purchase price shall be increased proportionately."

[¶4] The parties closed on the 105-acre parcel on March 8, 2013. On March 8, 2013, the parties also agreed to an additional amendment (fourth addendum) regarding the disputed property:

> 1. The parties agree to amend said Purchase Agreement, and all addendums, as follows:
>    a. The initial described option to purchase 120 acres, at the price of $16,000 per acre, is hereby *amended from an option to purchase, to a commitment to purchase* the described 120 acres on or before March 9, 2014.
> 2. The parties also agree that a payment of 2% of the total purchase price shall be made to Jared Lukenbill, payable by the Buyer, upon closing. To the knowledge of the parties, this agreement constitutes the final agreement by and between Jared Lukenbill and the undersigned parties.
> 3. There shall be no further deposit of earnest money for the remaining 120 acres.
>    . . . .

2

5. Lastly, the parties agree the tax increase set forth in the purchase agreement shall be calculated at a rate of 6.945%.

(Emphasis added.) The tax increase referred to in paragraph 5 of the fourth addendum again refers to paragraph 6(m) of the original purchase agreement. The same day, Templeton assigned its rights, title, and interest in and to the agreement to Northstar.

[¶5] On March 8, 2013, in connection with closing on the first parcel, Northstar signed a promissory note. In the promissory note, Northstar promised to pay Lukenbill $107,561 on or before January 1, 2014. The closing document shows the promissory note covers the payment for the "adjusted price" or "tax increase" referred to in provision 6(m) under the warranties of the seller. Northstar did not make payment before January 1, 2014. In March 2014, Northstar tendered, and Lukenbill deposited, $108,710 for the note, which included interest for late payment on the note.

[¶6] Lukenbill contracted to sell the disputed property to Tundra, setting a closing date of March 15, 2014. Tundra and Lukenbill closed on the 120-acre parcel, and Lukenbill gave Tundra a warranty deed for the property.

[¶7] Northstar filed a complaint against Lukenbill and Tundra. Northstar alleged Lukenbill breached the agreement and Tundra intentionally interfered with Northstar's agreement with Lukenbill. The parties moved for summary judgment. The district court granted summary judgment in part, concluding Northstar met the payment terms of the agreement by providing the promissory note before the payment date, and Lukenbill breached the contract by selling and conveying the disputed property to Tundra. The court later held a bench trial on the issue of Northstar's damages due to Lukenbill's breach of contract.

[¶8] Lukenbill added a crossclaim against Tundra for indemnification. Tundra answered and filed a counterclaim against Lukenbill, alleging breach of warranty deed. Lukenbill answered the counterclaim, arguing Tundra's claims are barred by equitable and promissory estoppel, unclean hands, and the guarantee of indemnity contained in the purchase agreement. The parties moved for summary judgment on the crossclaim and counterclaims. After a hearing, the

district court granted Lukenbill's motion for summary judgment on the issue of indemnification by Tundra and denied Tundra's motion for summary judgment on the issue of indemnification and breach of warranty.

[¶9] Northstar moved for summary judgment on its claim of intentional interference with contract against Tundra. The district court granted Northstar's motion for summary judgment, concluding Tundra intentionally interfered with Northstar and Lukenbill's contractual relationship.

[¶10] Lukenbill and Tundra appeal the district court's judgment disposing of the parties' claims.

II

[¶11] Our standard for reviewing a grant of summary judgment is well-established:

> Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In determining whether summary judgment was appropriately granted, we must view the evidence in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the record. On appeal, this Court decides whether the information available to the district court precluded the existence of a genuine issue of material fact and entitled the moving party to judgment as a matter of law. Whether the district court properly granted summary judgment is a question of law which we review de novo on the entire record.

*Berger v. Sellers*, 2023 ND 171, ¶ 7, 996 N.W.2d 329 (citation omitted).

4

## III

[¶12] Lukenbill argues the district court erred by granting Northstar's motion for partial summary judgment and concluding Lukenbill breached the agreement to sell and convey the disputed property. Lukenbill contends Northstar breached the terms of the contract and amendments by failing to pay $107,560.69 on or before January 1, 2014, relieving Lukenbill from its obligation to convey the disputed property under the agreement.

[¶13] Generally, "[t]he interpretation of a contract is a question of law. On appeal, this Court independently examines and construes the contract to determine if the district court erred in its interpretation." *Bearce v. Yellowstone Energy Dev., LLC*, 2019 ND 89, ¶ 14, 924 N.W.2d 791 (internal citation omitted).

[¶14] "The elements of a prima facie case for breach of contract are: (1) the existence of a contract; (2) breach of the contract; and (3) damages which flow from the breach." *Berger*, 2023 ND 171, ¶ 21 (internal citations omitted). "A breach of contract is the nonperformance of a contractual duty *when it is due*." *Id.* (emphasis added); *see also Behle v. Harr*, 2021 ND 190, ¶ 11, 965 N.W.2d 860 ("Absent repudiation and the accompanying anticipatory breach, '[b]reach of contract occurs when there is nonperformance of a contractual duty *when it is due*.'") (quoting *Good Bird v. Twin Buttes Sch. Dist.*, 2007 ND 103, ¶ 9, 733 N.W.2d 601); *Welch Constr. & Excavating, LLC v. Duong*, 2016 ND 70, ¶ 5, 877 N.W.2d 292 ("A breach of contract is the nonperformance of a contractual duty when it is due."); *WFND, L.L.C. v. Fargo Marc, L.L.C.*, 2007 ND 67, ¶ 13, 730 N.W.2d 841 (same). "The burden of proving the elements of a breach of contract is on the party asserting the breach." *WFND*, at ¶ 13.

[¶15] While construction of a written contract to determine its legal effect presents a question of law, "whether a party has breached a contract is a finding of fact." *Trosen v. Trosen*, 2022 ND 216, ¶ 29, 982 N.W.2d 527.

[¶16] The district court concluded the original agreement and subsequent amendments were a binding, legally-enforceable contract between Northstar and Lukenbill. The court further concluded Northstar was originally obligated to pay an "adjustment in purchase price" or "tax increase" under paragraph 6(m)

of the agreement by January 1, 2014. Although Northstar did not timely make the payment, the court held "Northstar's original obligation to pay the 'adjustment in purchase price' or 'tax increase' under paragraph (m) of the Agreement by January 1, 2014 was satisfied when Northstar gave to [Lukenbill]—and [Lukenbill] accepted from Northstar—the Note." The court explained: "Whether [Lukenbill] realized it or not, *by law*, the Note satisfied Northstar's obligation under the Agreement and became a separate, enforceable obligation between Northstar and [Lukenbill]. *See* N.D.C.C. § 41-03-36." The court wrote:

> The Note was given to [Lukenbill] and accepted by [Lukenbill] on March 8, 2013, which is well before the January 1, 2014 deadline in the Agreement. Therefore, Northstar timely met its obligation under the Agreement. Northstar did not breach the Agreement.

[¶17] The district court's reliance on N.D.C.C. § 41-03-36 to support its conclusion Northstar "satisfied" its payment obligation by giving Lukenbill the promissory note is misplaced. Section 41-03-36(2) relates to notes and uncertified checks. A note is a written promise by one party (the maker) to pay a fixed amount of money to the other party or to the bearer. N.D.C.C. §§ 41-03-03(e), (h), (i), 41-03-04(1), (5); *Black's Law Dictionary* 1272 (12th ed. 2024).

[¶18] Section 41-03-36(2), N.D.C.C., provides, "Unless otherwise agreed and except as provided in subsection 1, if a note or an uncertified check is taken for an obligation, *the obligation is suspended* to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken." (Emphasis added.) Section 41-03-36(2)(b) further provides, "In the case of a note, *suspension of the obligation* continues until dishonor of the note or until it is paid. Payment of the note results in discharge of the obligation to the extent of the payment." (Emphasis added.) With limited exception, not applicable here, section 41-03-36(2)(c) provides, if the note is dishonored, "the obligee may enforce either the instrument or the obligation."

[¶19] Under N.D.C.C. § 41-03-36(2), unless otherwise agreed, a note *suspends* the obligation; a note does not *satisfy* the obligation. The district court did not address where Lukenbill "otherwise agreed" the promissory note waived or

6

satisfied Northstar's payment obligation under the agreement. The promissory note does not include any language agreeing the note waives or satisfies Northstar's contractual obligation to pay the "tax increase" or "adjusted price" on or before January 1, 2014. Thus, as a matter of law, the promissory note did not *satisfy* Northstar's obligation to do so.

[¶20] Under N.D.C.C. § 41-03-36(2)(b), "[i]n the case of a note, suspension of the obligation continues until dishonor of the note or until it is paid." Section 41-03-59, N.D.C.C., provides the rules governing dishonor of a note. Relevant to the issue before this Court, section 41-03-59(1)(c) provides a "note is dishonored if it is not paid on the day it becomes payable." Under N.D.C.C. § 41-03-30(2)(b), an instrument payable at a definite time "becomes overdue on the day after the due date." Because Northstar did not pay the promissory note on January 1, 2014, it arguably was dishonored and overdue as of January 2, 2014. If the promissory note was dishonored, under section 41-03-36(2)(b) the suspension of Northstar's obligation to pay the "tax increase" or "adjusted price" was discontinued on January 2, 2014. Under section 41-03-36(2)(c), once the note was dishonored, Lukenbill could enforce either the note or Northstar's contractual obligation. Thus, based on the record before this Court, a genuine issue of material fact exists regarding whether Northstar breached the contract when it did not pay the "tax increase" or "adjusted price" on January 1, 2014.

[¶21] It is undisputed Northstar belatedly tendered, and Lukenbill deposited, $108,710 for the note. However, the payment was due for Northstar's previous purchase of the 105-acre parcel. Thus, Lukenbill's acceptance of the amount due for the purchase of the 105-acre parcel would not necessarily constitute a waiver of Northstar's failure to make the payment on January 1, 2014.

[¶22] On this record, we conclude the district court erred in holding as a matter of law that Lukenbill breached the agreement and Northstar did not breach the agreement. We conclude genuine issues of material fact preclude summary judgment on Northstar's breach of contract claim against Lukenbill.

[¶23] We reverse the district court's summary judgment on Northstar's breach of contract claim and remand to the court to address properly presented and preserved factual issues related to Northstar's breach of contract claim.

7

IV

[¶24] Tundra argues the district court erred by granting Northstar's motion for summary judgment against Tundra and denying Tundra's motion for summary judgment against Northstar on the issue of intentional interference with a contract.

[¶25] "Generally, an interference with contract claim contemplates a tortfeasor who either prevented a third party from entering into a contract or induced the third party to breach the contract with the plaintiff." *Thimjon Farms P'ship v. First Int'l Bank & Tr.*, 2013 ND 160, ¶ 12, 837 N.W.2d 327. "To establish a prima facie case for intentional interference with contract, a plaintiff must prove (1) a contract existed, (2) the contract was breached, (3) the defendant instigated the breach, and (4) the defendant instigated the breach without justification." *Berger*, 2023 ND 171, ¶ 48 (citation omitted). "In order to recover for wrongful interference with business, the plaintiff must prove the defendant's conduct was independently tortious or otherwise unlawful." *Thimjon*, 2013 ND 160, ¶ 16 (cleaned up).

A

[¶26] On this record, it is undisputed an agreement between Northstar and Lukenbill existed, meaning the first essential element of an intentional interference with contract claim is met. *Trosen v. Trosen*, 2014 ND 7, ¶¶ 10, 19, 841 N.W.2d 687 (noting the existence of a valid contract is an essential element of a claim for interference with contractual relations). However, as discussed above, genuine issues of material fact exist regarding whether the second element of an intentional interference with a contract claim is met, i.e., whether Lukenbill breached that agreement by failing to convey the disputed property to Northstar. Thus, the district court erred in granting Northstar summary judgment on its intentional interference with contract claim.

B

[¶27] Tundra argues the district court erred by concluding, as a matter of law, Tundra intentionally interfered in the agreement between Northstar and

8

Lukenbill, Tundra instigated Lukenbill's breach of the agreement, and Tundra acted without justification. Although we are reversing the court's judgment on grounds factual disputes exist regarding whether Lukenbill breached the agreement, we address Tundra's other arguments because they are likely to arise on remand if, after resolving the factual disputes, the court finds Lukenbill breached the agreement. *Wollan v. Innovis Health, LLC*, 2024 ND 169, ¶ 15, 11 N.W.3d 1.

[¶28] To prevail on a claim of intentional interference with contract, the plaintiff must "show that the defendant acted intentionally, and the intent required goes beyond the traditional tort concept of intent. The plaintiff must show that the defendant specifically intended to interfere with the plaintiff's contractual rights, or acted with knowledge that the interference would result." *Peterson v. Zerr*, 477 N.W.2d 230, 234 (N.D. 1991).

[¶29] "A party's intent generally presents a question of fact." *G&D Enters. v. Liebelt*, 2020 ND 213, ¶ 25, 949 N.W.2d 853; *see also Hecker v. Stark Cnty. Soc. Serv. Bd.*, 527 N.W.2d 226, 229 (N.D. 1994) ("Intent is a question of fact."). A party's motive, knowledge, and state of mind also generally present questions of fact. *Norberg v. Norberg*, 2017 ND 14, ¶ 17, 889 N.W.2d 889; *Burr v. Kulas*, 1997 ND 98, ¶ 11, 564 N.W.2d 631. "Factual questions, when material and in dispute, generally preclude summary judgment." *Burr*, at ¶ 11.

[¶30] Factual disputes exist regarding Tundra's knowledge and intent. This is particularly true when Tundra is "given the benefit of all favorable inferences which can reasonably be drawn from the record." *Berger*, 2023 ND 171, ¶ 7.

1

[¶31] In granting Northstar summary judgment, the district court held, as a matter of law, that Tundra acted intentionally and without justification in instigating Lukenbill's breach of the purchase agreement. The court specifically held Tundra had "actual knowledge" of both the purchase agreement and the March 2013 fourth addendum to the agreement that, among other things, amended Northstar's "option" to purchase the disputed property to a "commitment." However, disputed facts exist regarding Tundra's actual

9

knowledge of the purchase agreement's terms, including whether Tundra knew about the fourth addendum changing Northstar's purchase option to a "commitment."

[¶32] In the record, there is an email dated May 9, 2013, from Karen Horob, Lukenbill's managing partner, to Igor Gary Fendich, who owns and operates Tundra as its sole member. The original agreement between Lukenbill and Templeton is attached to the email. The email reads:

> My scanner was acting up so the last page I had to do separate, but I think it all came out. Line 19 it says something about the law. Don't know if that one will affect this. Let me know what your lawyer thinks. This contract at first said 125 and 100 for the option acres, but then was put at 120 and 105 on another page. Then he bought the 105 first instead of the 120. This contract like any, is confidential as you know. Don't let this get out that you have seen this.

Horob's email did not state the "option" to purchase had been changed to a "commitment." It also did not mention any amendments to the agreement or the closing dates.

[¶33] In her 2017 deposition, Horob recalled that she emailed Fendich the original agreement between Lukenbill and Northstar with the pricing redacted; she did not testify any addenda were attached. When asked if she remembered showing Fendich any other documents between Lukenbill and Northstar, Horob responded, "No." The following exchange then occurred:

> Q. Do you ever remember explaining things from those other documents between Lukenbill and Northstar to Mr. Fendich?
> A. No, I don't remember anything like that.

Horob then testified she only remembers showing the original agreement to Fendich.

[¶34] Horob further testified she did not tell Fendich or Tundra that Northstar had a commitment to purchase the disputed property:

> Q. So you believed that you disclosed to Tundra that there was a commitment to purchase from Northstar for the disputed property?

10

. . . .

A. It wasn't Tundra. It was Thi [Huynh].

Q. And he's the attorney?

A. Yeah, I know, but, I mean, I just talked to Thi about it. I didn't tell [Fendich].

Q. Okay. Did you mean to not tell Gary Fendich that there was not—

A. No.

Q. —a commitment?

A. No. I just didn't even think about it at the time, I guess.

[¶35] In his 2023 deposition, Fendich denied reading the May 9, 2013 email and seeing the original agreement at that time:

> Q. And so your testimony right now is—looking at this is you never read or received the May 9, 2013, email from Karen Horob issued at 9:08 p.m.?
> A. The email that she sent, I don't know if there's attachments. I don't know—I'm telling you I did not see her contract and I did not read that email.

Fendich also denied seeing the March 2013 fourth addendum to the original agreement and testified he was not aware Templeton had an option: "I have not seen that document. And, clearly, I wasn't aware that they had an option to purchase."

[¶36] The district court held Tundra conceded it received a copy of the original agreement, and further concluded Tundra had knowledge of the fourth addendum because Thi Huynh, "as Tundra's lawyer," received, reviewed, and opined on the effect of the original agreement and the fourth addendum. The record contains a legal opinion from the Intrepid Law Group, signed by attorney Thi Huynh, analyzing the original agreement and its subsequent amendments, and specifically the change from "option" to purchase to "commitment" to purchase. The court imputed Huynh's knowledge of the fourth addendum to Fendich "as Tundra's attorney." However, as Tundra argues, disputed facts exist as to whom, if anyone, attorney Huynh represented at that time.

[¶37] From the record, Huynh's May 13, 2013 legal opinion was addressed to Lukenbill, not Tundra. Around May 9, 2013, Fendich introduced attorney Huynh

11

to Horob. Although Fendich testified in his 2017 deposition that attorney Huynh represented Tundra, he clarified the scope of Huynh's representation in a subsequent 2023 deposition. Fendich testified he introduced Huynh to Horob after learning she was upset about Lukenbill's situation with Northstar and "because she was asking me stuff that I didn't have answers to." He testified he believed Horob was getting or trying to get advice from Huynh. Fendich also testified he never saw the May 13, 2013 legal opinion. Additionally, in her deposition, Horob testified she "kind of felt like [Huynh] was my counsel also, I guess . . . ." Because the legal opinion was sent to Lukenbill and a disputed fact exists as to whether the legal opinion was ever shown to Tundra, a genuine issue of material fact exists regarding whom Huynh represented in the transaction between Lukenbill and Tundra.

[¶38] The district court concluded Fendich's sworn statements did not create a disputed fact regarding whether Huynh was Tundra's attorney, writing Fendich's sworn statements "were made after the filing of the Motion. Those subsequent statements create a 'sham factual issue' and are 'ignore[d]' by this Court." Without providing further analysis regarding why it ignored Fendich's deposition testimony, the court cited 73 Am. Jur. 2d *Summary Judgment* § 57; *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983); and *City of St. Joseph v. Southwestern Bell Telephone*, 439 F.3d 468, 475-76 (8th Cir. 2006).

[¶39] 73 Am. Jur. 2d *Summary Judgment* § 57, cited by the district court, explains the sham affidavit doctrine:

> Under the sham affidavit doctrine, a statement in an affidavit made solely to create issues of fact for purposes of surviving summary judgment will be disregarded. A court may ignore a declaration if it conflicts with the witness's earlier sworn statements and would create a sham factual issue. Accordingly, a person may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing that person's own sworn testimony without demonstrating a plausible explanation for the conflict. The party offering the affidavit must offer persuasive reasons for believing the supposed correction is more accurate than the prior testimony. To invoke the summary judgment contradictory affidavit rule, the

12

inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous.

(Footnotes omitted.)

[¶40] *Camfield*, also cited by the district court, explains, "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." 719 F.2d at 1365. In *Camfield*, the court noted there were no circumstances, such as confusion or mistake, explaining why the deponent's subsequently filed affidavit directly contradicted his sworn deposition testimony. *Id.* Thus, the "affidavit created a sham issue of fact instead of a genuine one," making summary judgment appropriate. *Id.*

[¶41] Addressing the sham affidavit doctrine, in *City of St. Joseph*, the court cautioned that district courts "must use extreme care in examining such issues and only grant summary judgment where 'the conflicts between the deposition and affidavit raise only sham issues.'" 439 F.3d at 476 (quoting *Camfield*, 719 F.2d at 1366). "Accordingly," the court continued,

> when the affiant states in his affidavit that he was confused in his deposition or where the affiant needs to explain portions of his deposition testimony that were unclear, the district court should not strike the affidavit from the record. In addition, when the affiant's affidavit does not actually contradict his earlier testimony, the district court should not strike the affidavit from the record.

*Id.* (cleaned up).

[¶42] This Court has stated, "A 'sham affidavit' is defined as '[a]n affidavit that contradicts clear testimony given by the same witness, [usually] used in an attempt to create an issue of fact in response to a motion for summary judgment.'" *Hysjulien v. Hill Top Home of Comfort, Inc.*, 2013 ND 38, ¶ 23, 827 N.W.2d 533 (quoting *Black's Law Dictionary* 67 (9th ed. 2009)). After quoting the caution in *City of St. Joseph* that district courts "must use extreme care in examining such issues and only grant summary judgment where 'the conflicts between the deposition and affidavit raise only sham issues,'" this Court

13

concluded the affidavit at issue presented "a factual dispute for the factfinder to resolve." *Id.* at ¶¶ 23, 26. Viewing the affidavit "in context," we concluded "a reasonable factfinder would not necessarily conclude [the affiant's] assertions . . . are directly contrary to her earlier statements under oath to the Department." *Id.* at ¶ 26. We also noted the "affidavit is not an attempt to contradict prior deposition testimony, but rather to explain her statements under oath to the Department." *Id.* at ¶ 27. We concluded the affidavit raised a genuine issue of material fact. *Id.*

[¶43] The sham affidavit doctrine does not support the district court's rejection of Fendich's deposition testimony. Fendich's deposition was noticed and taken by Lukenbill. The record does not show when the notice of deposition was served. However, Northstar filed its motion one week *before* the deposition, making it very likely the deposition was noticed and scheduled before Northstar's motion was filed and not in response to it.

[¶44] More important than the timing of the deposition, Fendich's sworn testimony is in response to questions asked to him during discovery by an opposing party. Fendich did not prepare an affidavit to contradict his prior testimony and create a factual issue; he responded under oath to questions asked by an opposing party. Northstar was represented at the deposition and also asked Fendich questions.

[¶45] Moreover, Fendich's deposition testimony did not clearly and unambiguously contradict his prior testimony. To the extent Fendich's deposition testimony explained or clarified his prior testimony, it was due to an opposing party's questions.

[¶46] Fendich did not prepare an affidavit to contradict his prior testimony and create a factual issue; rather, he participated in a noticed discovery deposition. We hold the district court misapplied the sham affidavit doctrine and improperly resolved a factual dispute regarding whether Huynh was Tundra's attorney.

[¶47] There are disputed facts regarding what Tundra knew about the agreement between Lukenbill and Northstar, including whether Tundra knew

Northstar had a commitment to purchase the 120-acre parcel. To be subject to liability for intentional interference with a contract, "the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract." Restatement (Second) of Torts § 766 cmt. i. (1979). Even if the actor's conduct causes another party to fail "to perform a contract, the actor does not induce or otherwise intentionally cause that failure if he has no knowledge of the contract." *Id.* Although Tundra knew of the existence of the original agreement, there are disputed facts regarding whether and to what extent Tundra knew about the subsequent amendments, including Northstar's commitment to purchase the 120-acre parcel, precluding the grant of summary judgment.

[¶48] There are also disputed facts regarding what action Tundra took to instigate Lukenbill's breach of its agreement with Northstar. In granting Northstar summary judgment, the district court held Tundra "knew" Lukenbill could not sell the disputed property to Northstar if Lukenbill sold the disputed property to Tundra and it was obvious the "necessary consequence of [Tundra's] action" would be Lukenbill's inability to perform under the agreement with Northstar. The court held Tundra "clearly induced" Lukenbill to act because Tundra provided Lukenbill the written agreement for indemnification and Huynh's legal opinion promised Lukenbill "[it] ha[d] nothing to worry about" "should [it] sell this land to Gary Fendich." The court held Tundra "knew" Lukenbill was not indicating to Northstar that Lukenbill thought it was justified in backing out of the agreement and Tundra also kept the information exchanged confidential "while instigating the breach."

[¶49] However, the record shows it was Lukenbill that was upset with Northstar after closing on the first parcel and Northstar's request Lukenbill sign the fourth addendum. In an April 2013 email from Horob to Fendich, Horob stated: "I am pissed that Dwain [Davis, manager of Templeton] did this to me and so is the family. It will be worked out. God will make sure. Nothing good will ever come out of dishonest people. NOTHING!!" Horob also testified she desired to get out of the agreement with Northstar:

Q. That's where we're going to kind of veer into. So you previously testified that you kind of made your decision on your own to sell the property to Tundra.
A. Yeah. I talked to my brother Tom Luken—yeah, Thomas Lukenbill about the—the property, the 120 acres, and how I felt like I was kind of being bullied on the closing. And so I talked to him about just how I felt, I guess, you know, and— . . . .

Horob further testified: "Just that I felt, you know, that I was kind of bullied and if we could get out of the contract, I think, or something, something like that." In response to a question whether she wanted to get out of the agreement, Horob testified, "Yeah."

[¶50] In his 2023 deposition, Fendich testified Horob told him Northstar was "mistreating her. They're not being fair. They're not performing, et cetera, et cetera."

[¶51] The evidence establishes Lukenbill's desire to get out of the agreement with Northstar and shows disputed facts exist on whether Tundra instigated Lukenbill's breach of the agreement with Northstar.

2

[¶52] Disputed facts also exist regarding whether Tundra acted without justification.

[¶53] "The test for proving justification is what is reasonable conduct under all the circumstances of the case." *Ebel v. Engelhart*, 2024 ND 168, ¶ 27, 11 N.W.3d 10 (quoting *Thimjon*, 2013 ND 160, ¶ 13). "Even where the evidence shows a defendant interfered with a contract, the defendant's actions are justified if they are done for legitimate business concerns and did not maliciously seek to damage the plaintiff." *Id.* (quoting *Thimjon*, at ¶ 13).

[¶54] "[O]rdinarily justification is a question of fact, but justification can be decided as a matter of law by showing a defendant was justified by a lawful object which he had a right to assert." *Ebel*, 2024 ND 168, ¶ 27 (quoting *Thimjon*, 2013 ND 160, ¶ 13). Restatement (Second) of Torts § 767 (1979) lists some factors the factfinder may consider in determining whether interference with a contract

16

was "improper" or "without justification." *Ebel*, at ¶ 30 (explaining "[w]e have never adopted this seven-factor test, required an analysis of each and every factor, or stated these factors comprise an exhaustive list"). One of those factors, the defendant's motive, is "highly determinative" of the issue whether the defendant's actions were without justification. *Hennum v. City of Medina*, 402 N.W.2d 327, 336 (N.D. 1987) (quoting *Blair v. Boulger*, 336 N.W.2d 337, 341 (N.D. 1983)). When motive is at issue, defendants should generally be allowed the opportunity to provide evidence regarding their motives. *Schuhmacher v. N.D. Hosp. Ass'n*, 528 N.W.2d 374, 382 (N.D. 1995).

[¶55] This Court has repeatedly stated "justification can be decided as a matter of law by showing a defendant was justified by a lawful object which he had a right to assert." *Ebel*, 2024 ND 168, ¶ 27; *see also Thimjon*, 2013 ND 160, ¶ 13; *Hilton v. N.D. Educ. Ass'n*, 2002 ND 209, ¶ 26, 655 N.W.2d 60; *Fankhanel v. M & H Constr. Co.*, 1997 ND 20, ¶ 10, 559 N.W.2d 229. However, this Court has never stated the lack of justification can be decided as a matter of law. Whether a party asserted a lawful right may be a legal issue; a party's knowledge and intent are factual. Thus, as a matter of law, a defendant may have asserted a lawful right, meaning the defendant's action was justified. Although it can be decided as a matter of law a defendant did not assert a lawful right, defendant's motive and knowledge cannot generally be determined as a matter of law. Thus, whether a defendant *was not justified* is a question of fact.

[¶56] This Court affirmed dismissal of an interference with a contract claim when no contract existed, meaning the first essential element of an intentional interference with contract claim could not be met. *See Trosen*, 2014 ND 7, ¶¶ 10, 19 ("In granting the motion for judgment as a matter of law, the district court correctly noted that the existence of a valid contract was an essential element of Jeff Trosen's claims for breach of contract and interference with contractual relations."). It also affirmed dismissal of intentional interference with contract claims when the contract was not breached, the second essential element of an intentional interference with contract claim. *See Berger*, 2023 ND 171, ¶ 48 (affirming summary judgment dismissing intentional interference with a contract claims when the construction contract and construction loan agreement were not breached); *N. Plains All., L.L.C. v. Mitzel*, 2003 ND 91, ¶ 23, 663 N.W.2d

169 ("Because there was no breach, an essential element of [plaintiff's] intentional interference with contract claim is missing and summary judgment was appropriate."); *Soentgen v. Quain & Ramstad Clinic, P.C.*, 467 N.W.2d 73, 84 (N.D. 1991) ("Because Q & R did not breach its contract with Soentgen, the trial court properly granted summary judgment on this [interference with contract] claim."). And it has affirmed dismissal of intentional interference with a contract claims when, as a matter of law, the defendant's action was justified because the defendant was asserting a legal right. *See Ebel*, 2024 ND 168, ¶ 28 (concluding bidder "was justified in inquiring whether his bids were considered and pursuing his claim that he was the highest bidder"); *N.D. Energy Servs., LLC v. Lime Rock Res. III-A, L.P.*, 2024 ND 159, ¶¶ 22-24, 10 N.W.3d 591 (affirming grant of summary judgment concluding defendant's actions were justified when defendant pursued its rights under lease and surface use agreements); *Thimjon Farms P'ship*, 2013 ND 160, ¶ 14 (affirming summary judgment dismissing intentional interference with contract claim because "[c]ollection of a debt past its maturity date is a legitimate business concern"); *Hilton*, 2002 ND 209, ¶ 28 (affirming summary judgment dismissing teacher's claim for intentional interference with contract when the education association "was justified, as a matter of law, in requiring compliance with the negotiated agreement"); *Fankhanel*, 1997 ND 20, ¶ 13 (affirming district court's order granting summary judgment because defendant business "had a legitimate business reason to exclude" plaintiff who "had not paid his debt" to the business from delivering product to the business's job site). However, this Court has never affirmed summary judgment dismissing an intentional interference with a contract claim on the ground the defendant's action was *not* justified. *See Hennum*, 402 N.W.2d at 339 (reversing summary judgment holding a tortious interference with contract occurred because defendant's intent or good faith "is relevant to the determination of tortious interference with contractual relations" and the district court "did not give credence to the alleged fact" the defendant was justified in terminating plaintiff's employment). It would be the extremely rare case where the determination a defendant acted *without* justification could be decided as a matter of law rather than fact; the record below demonstrates this is not such a case.

18

[¶57] In granting Northstar summary judgment, the district court held, as a matter of law, Tundra's instigation of Lukenbill's breach of the agreement was without justification. The court held Tundra "did not posit that it was justified in instigating [Lukenbill's] breach of the Agreement or provide any evidence or argument to contradict the arguments and evidence presented by Northstar on that issue." However, as discussed, disputed facts exist regarding what Tundra knew about the amendments to the contract and specifically whether Tundra was aware Northstar had an existing contractual commitment to purchase the property. There is evidence Lukenbill did not disclose the full extent of its dealings with Northstar to Tundra, including the commitment to sell the disputed property to Northstar. Further, in the "seller's/owner's affidavit," Lukenbill made sworn assurances there were "no unrecorded contract[s] for sale, liens, encumbrances or easements which affect[ed] the marketability of title" to the disputed property. Further, in the warranty deed, Lukenbill warranted to Tundra it was "well seized in fee of the land" and had "good right to sell and convey the same," and that the land was "free from all encumbrances."

[¶58] Interestingly, having determined Huynh was Tundra's attorney, the district court imputed Huynh's knowledge regarding the fourth addendum to the contract to Tundra and Fendich. However, in the legal opinion to Lukenbill, Huynh wrote, "It is of my legal opinion that this 'option' that was originally in the contract is invalid." If the court was going to impute Huynh's knowledge to Tundra, it should also have imputed to Tundra Huynh's opinion the contract was invalid. Tundra's imputed knowledge there is a legal opinion concluding the original contract is invalid is relevant to the factual question of justification.

[¶59] In concluding Tundra acted without justification, the district court purported to analyze the relevant factors and characterized Tundra's motives as improper in the transaction with Lukenbill. The court wrote, "Tundra acted in secret with knowledge, in its own personal interest, fueled by greed. Tundra did not have a legitimate business opportunity; Tundra was merely looking to forward its own selfish interests at the expense of Northstar by its interference with the Agreement." The court further stated, "Tundra contending that it had any intention of developing the Disputed Property is a façade." The court continued, "Tundra had dollar signs in its eyes; greed was its wrongful motive,

19

and Fendich did everything Tundra needed and had to do to obtain the Disputed Property."

[¶60] Summary judgment should not constitute "mini-trials of factual issues" and is not appropriate when "the court must draw inferences or make findings on disputed facts." *THR Mins., LLC v. Robinson*, 2017 ND 78, ¶ 15, 892 N.W.2d 193. "A finding of fact is reached by natural reasoning, and a conclusion of law is reached by fixed rules of law." *Id.* (quoting *Nygaard v. Robinson*, 341 N.W.2d 349, 354 (N.D. 1983)). We have explained that "when the facts are undisputed and more than one inference may be drawn, *the determination of the inference drawn is a finding of fact*." *Id.* (emphasis added). Although the district court labeled its statements as the application of law to material undisputed facts, the court's specific statements ascribing improper or wrongful motives to Tundra in the transaction are quintessential fact finding and inappropriate in the summary judgment context.

[¶61] We conclude genuine issues of material fact precluded the district court from granting Northstar summary judgment on its intentional interference with a contract claim against Tundra.

V

[¶62] Tundra argues the district court erred by granting Lukenbill's motion for summary judgment against Tundra and denying Tundra's motion for summary judgment against Lukenbill on the issue of indemnity. Tundra argues the claim for indemnity is precluded by the doctrine of equitable estoppel. Tundra also argues the warranty deed, not the purchase agreement, represents the final agreement between the parties.

[¶63] "Construction of a written contract to determine its legal effect is a question of law, which is fully reviewable on appeal." *Specialized Contracting, Inc. v. St. Paul Fire & Marine Ins. Co.*, 2012 ND 259, ¶¶ 13-14, 825 N.W.2d 872 (citing *Hoge v. Burleigh Cnty. Water Mgmt. Dist.*, 311 N.W.2d 23, 27 (N.D. 1981)). "An indemnity contract is interpreted applying the general rules for contract interpretation." *Id.* This Court has explained:

20

The indemnity provision should be interpreted to give effect to the parties' mutual intentions if it can be done consistently with legal principles. *See* N.D.C.C. § 9-07-03. The parties' intent is to be ascertained from the writing alone if possible. *See* N.D.C.C. § 9-07-04. We consider the indemnity contract as a whole and give effect to every part. N.D.C.C. § 9-07-06. In determining whether or not the trial court erred as a matter of law in its construction of the contract we must be guided first by the language of the contract itself, and where the contract is clear and unambiguous there is no reason to go further. We give words in a contract their plain, ordinary, and commonly understood meaning unless they are used by the parties in a technical sense or a special meaning is given to them by usage. N.D.C.C. § 9-07-09.

An indemnity is "a contract by which one engages to save another from a legal consequence of the conduct of one of the parties or of some other person." N.D.C.C. § 22-02-01. Indemnification is a remedy which allows a party to recover reimbursement from another for the discharge of a liability which, as between them, should have been discharged by the other. We have recognized that indemnity is an equitable doctrine, which is not amenable to hard and fast rules.

*Specialized Contracting*, 2012 ND 259, ¶¶ 13-14 (cleaned up). Section 22-02-07, N.D.C.C., governs interpretation of an indemnity contract, unless a contrary intention appears.

A

[¶64] The indemnity provision in the purchase agreement between Lukenbill and Tundra provides:

Buyer agrees to indemnify Seller with regard to all aspects of any previous potential liability for entering and executing this contract with Buyer. Buyer is aware that a third party is claiming to have an option to purchase this same property. Buyer hereby agrees to fully defend Seller from any and all claims regarding this dispute should it ever arise. Seller will never face any liability from executing this agreement with Buyer in regard to any previous agreements.

21

[¶65] The district court concluded Lukenbill "is entitled to indemnification from Tundra, for the judgment rendered against it as a result of the sale of the Disputed Property as well as for the fees and expenses it incurred in defending the underlying litigation and the fees and expenses it incurred in seeking indemnification from Tundra." The terms of the indemnity clause are clear and unambiguous. The terms comply with N.D.C.C. § 22-02-07 and do not reveal any contrary intentions.

B

[¶66] In an attempt to defeat the plain language of the indemnity provision, Tundra argues Lukenbill's indemnity claim is precluded by the doctrine of equitable estoppel. Tundra asserts Lukenbill "induced" it to complete the property purchase with "false assurances and the wrongful withholding of material facts." Lukenbill argues the doctrine of unclean hands applies and Tundra is not a good-faith purchaser.

[¶67] The district court concluded Tundra is not a good-faith purchaser and cannot rely on the doctrine of equitable estoppel. "The equitable doctrines of estoppel and laches are unavailable to a party who does not come into equity with 'clean hands.'" *Fredericks v. Fredericks*, 2016 ND 234, ¶ 29, 888 N.W.2d 177. "Furthermore, a party who is not a good-faith purchaser cannot rely on the doctrines of equitable estoppel and laches." *Id.*

[¶68] Section 1-01-21, N.D.C.C., defines "good faith" as "an honest intention to abstain from taking any unconscientious advantage of another even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious." "Whether a party acted in good faith is a question of fact." *Fredericks*, 2016 ND 234, ¶ 23. We have further explained,

> A party's status as a good[-]faith purchaser without notice of a competing interest is a mixed question of fact and law. This Court has determined the facts necessary to determine whether a party has attained the status of a good-faith purchaser without notice constitute findings of fact. On the other hand, a trial court's ultimate

determination a party acted in good faith constitutes a conclusion of law.

*Ebel*, 2024 ND 168, ¶ 25 (quoting *Sundance Oil & Gas, LLC v. Hess Corp.*, 2017 ND 269, ¶ 12, 903 N.W.2d 712).

[¶69]  For the reasons discussed above, we conclude genuine issues of material fact exist regarding whether Tundra was a good-faith purchaser, making the district court's grant of summary judgment denying Tundra's equitable estoppel defense improper.

C

[¶70] Tundra argues the district court erred by dismissing its claims against Lukenbill for breach of warranty deed. Tundra argues the warranty deed supersedes the purchase agreement and Lukenbill breached the terms of the warranty deed. Tundra relies on the merger doctrine.

[¶71] Citing N.D.C.C. § 10-32.1-84, the district court held Tundra is prohibited from maintaining its breach of contract claim against Lukenbill because it "does not have a certificate of authority to transact business in North Dakota." *See* N.D.C.C. § 10-32.1-84(1) ("A foreign limited liability company transacting business in this state may not maintain an action or proceeding in this state unless it has a certificate of authority to transact business in this state."); *compare* N.D.C.C. § 10-32.1-84(1) ("The failure of a foreign limited liability company to have a certificate of authority to transact business in this state does not . . . prevent the company from defending an action or proceeding in this state."). The court further concluded the merger doctrine does not apply.

[¶72] In its brief, Tundra argued the district court erred in its conclusion the merger doctrine does not apply. Tundra did not challenge the court's conclusion Tundra is prohibited from maintaining its breach of contract claim against Lukenbill. Issues not briefed on appeal are waived. *See Hoever v. Wilder*, 2024 ND 58, ¶ 5, 5 N.W.3d 544 (explaining a party waives an issue by not providing supporting argument); *Trosen*, 2022 ND 216, ¶ 33 ("We do not consider arguments that are not adequately articulated, supported, and briefed."); *see also* N.D.R.App.P. 28(b)(7)(A) (providing argument in an appellant's brief must

23

contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"). Because Tundra "did not brief or otherwise challenge the court's dismissal of [its] breach of contract claim" on the ground Tundra was prohibited from maintaining it, Tundra waived the issue and we decline to address it. *Bearce*, 2019 ND 89, ¶ 29 (declining to address dismissal of breach of contract claim when appellant did not brief or otherwise challenge the court's dismissal of the claim).

[¶73] We previously concluded genuine issues of material fact exist regarding whether Tundra was a good-faith purchaser. The same or similar factual issues prevent us from resolving Tundra's argument the merger doctrine precludes Lukenbill's enforcement of the purchase agreement's indemnity provision. On remand, the district court may consider this and other defenses properly preserved below.

[¶74] We affirm the district court's judgment dismissing Tundra's breach of contract claim because Tundra did not challenge dismissal of the claim on the ground Tundra could not maintain the claim.

VI

[¶75] We have considered the parties' remaining issues and arguments and conclude they are either unnecessary to our decision or are without merit. We conclude the district court erred by granting Northstar summary judgment on its breach of contract claim against Lukenbill; erred by granting Northstar summary judgment on its intentional interference with contract claim against Tundra; and erred by granting Lukenbill summary judgment on its indemnification claim against Tundra. We affirm the court's grant of summary judgment dismissing Tundra's breach of warranty claim against Lukenbill. We affirm in part, reverse in part, and remand the case to the court for further proceedings consistent with this opinion.

[¶76]  Jon J. Jensen, C.J.
         Daniel J. Crothers
         Lisa Fair McEvers
         Jerod E. Tufte
         Douglas A. Bahr

24